UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JASON C KAELIN,<br><br>                    Plaintiff,<br><br>v.<br><br>WARDEN RANDY BLADES;<br>WARDEN ALBERTO RAMIREZ; DR.<br>KENNETH KHATAIN and DR.<br>SCOTT ELIASON,<br><br>                    Defendants. | Case No. 1:15-cv-00065-EJL-CWD<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Pending before the Court are Defendants' motions for summary judgment. (Dkt. 49, 50.) Having reviewed the parties' briefs, as well as the record in this matter, the Court concludes oral argument is unnecessary. Dist. Idaho L. Rule 7.1. Accordingly, the Court enters the following report recommending the motions for summary judgment be granted and the complaint against Defendants be dismissed with prejudice.

# FACTS[1]

Kaelin is a prisoner in the custody of the Idaho Department of Correction (IDOC), currently housed at the Idaho Maximum Security Institution (IMSI) after having been transferred from the Idaho State Correctional Center (ISCC). Kaelin alleges that a state court previously ordered that he is to receive certain medications, as well as psychotherapy, to treat his mental illness while he is incarcerated. Am. Compl. (Dkt. 11, at 3.) Kaelin suffers from PTSD and experiences "mental pain and anguish" as a result of his bipolar mood swings. *Id*. Kaelin alleges that Defendant Khatain informed him that the IDOC would not allow Kaelin to take the medications identified in the state court order and that individual psychotherapy was not available. Kaelin alleges also that Khatain was advised by the United States Attorney for the District of Idaho that Kaelin should receive the treatment ordered by the state court.

The state court order to which Kaelin refers in his complaint is titled "Amended Order Authorizing Treatment Pursuant to I.C. § 19-2523 (Confidential)." It was issued by Judge Steve Verby of the District Court of the First Judicial District of the State of Idaho, Bonner County. (Dkt. 11-1 at 6-9.) The order provided direction to Kaelin that he "shall continue to receive the psychiatric medications described in Exhibit 'A' attached [t]hereto, and shall also receive continued psychotherapy." *Id*. at 7. The court reasoned that "a reasonable person would consent to treatment." *Id.* The order does not specify continuing one-on-one psychotherapy. *Id.*

---

[1] The facts contained in this section are undisputed unless otherwise indicated. When the facts are disputed, they are taken in the light most favorable to Kaelin, the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (recognizing the district court's obligation to construe the record in the light most favorable to the nonmoving party on motion for summary judgment).

Attached to the order is a list of medications, including psychiatric medications Adderall, Zyprexa, Alprazolam, Citalopram, and Depakote Extended Release. (Dkt. 49-4 at 3-5; Dkt. 11-1 at 7-8.) The list also includes Percocet for pain, Testosterone, and Bactroban skin cream for infection. *Id.*

Kaelin contends that his mental health treatment since July of 2014 has been constitutionally deficient. Kaelin claims also that Defendants have violated state law in their treatment of him. The Court permitted Kaelin to proceed with his claims for deliberate indifference and state law claims for medical negligence against Defendants Blades, Ramirez, Khatain, and Eliason. (Dkt. 8, 27.)

Defendants supplied the medical treatment records documenting the health care Kaelin has received. A close examination of the record reveals the following.

**Treatment Records of Drs. Khatain and Eliason**

On February 2, 2014, at ISCC, Dr. Khatain increased Depakote to 1500 mg by mouth every morning x 30 days in response to Kaelin contending that his mental health symptoms were getting worse, discontinued the existing Effexor order, ordered crushed Effexor (to treat depression and anxiety) 150 mg by mouth every morning x 30 days, ordered labs to check valproic acid levels (Depakote levels), ordered Prolixin (anti-psychotic) 4 mg by mouth every night at bedtime, and ordered Benadryl (for anxiety) 25 mg by mouth twice per day. Eliason Decl., ¶ 3 (Dkt. 49-4 at 2-3); (Dkt. 49-5 at 13, 20; 49-6 at 17.)

On February 15, 2015, Kaelin requested that Dr. Khatain change his medications. (Dkt. 49-5 at 21.) In response to Kaelin's concern form, on March 4, 2014, Dr. Khatain

ordered Depakote (for bipolar disorder) at bedtime. (Dkt. 49-5 at 12.) On March 8, 2014,

Dr. Khatain discontinued Prolixin (antipsychotic) because Kaelin was not taking it and he

had documented nausea. (Dkt. 49-5 at 12.) On March 16, 2014, Dr. Khatain ordered

Prazosin (for nightmare suppression) 1 mg by mouth every night at bedtime and Prazosin

1 mg by mouth as needed. (Dkt. 29-5 at 11, 19; 49-6 at 16.)

       On April 13, 2014, Dr. Khatain noted that Kaelin reported the Prazosin had been

helpful in decreasing the frequency and intensity of his nightmares. (Dkt. 49-6 at 15.)

But, because Kaelin had stopped taking Prazosin,[2] Dr. Khatain discontinued it. Dr.

Khatain also decreased the dosage of Depakote to 500 mg by mouth twice per day x 30

days, decreased Effexor to 75 mg by mouth every morning x 14 days, decreased Benadryl

to 25 mg by mouth at bedtime x 30 days, and ordered Prozac (anti-depressant) 20 mg by

mouth every morning x 14 days then 40 mg by mouth every morning x 30 days. dkt 49-5

at 10-11, 19; Dkt. 49-6 at 15.)

       On April 28, 2014, Dr. Khatain noted that he saw and assessed Kaelin. (Dkt. 49-5

at 18.) On May 18, 2014, Dr. Khatain restarted Effexor 75 mg by mouth every morning x

30 days, discontinued both Prazosin orders, and ordered Prazosin 1 mg by mouth every

night at bedtime for nightmares. (Dkt. 49-5 at 10; 49-6 at 14.)

       On June 29, 2014, Dr. Khatain decreased Effexor to 37.5 mg by mouth every

morning for eight days, then to discontinue this drug, renewed Prozac 40 mg by mouth

every morning x 30 days, discontinued Prazosin, ordered Propranolol 10 mg by mouth

---

[2] It is not clear from the medical records why Kaelin voluntarily stopped taking the Prazosin when he reported it had been helpful.

**REPORT AND RECOMMENDATION  - 4**

twice per day and as needed for anxiety, decreased Depakote to 250 mg by mouth every morning and 500 mg by mouth at bedtime x 30 days, and continued Benadryl 25 mg by mouth at bedtime and as needed for agitation x 30 days. (Dkt. 49-5 at 9; 49-6 at 12-13.)

On July 25, 2014, Kaelin expressed discontent with his medications, citing the state court order requiring him to be on certain medications. Kaelin wanted "medical staff to fix it." (Dkt. 49-6 at 7.) Upon observation by A. Nicodemus, LMSW, Kaelin was noted to "be at his baseline at this time. He made eye contact …and did not report any mental health symptoms." *Id.* On July 26, 2014, Dr. Khatain noted that he saw and assessed Kaelin. (Dkt. 49-5 at 17.) On July 28, 2014, Dr. Khatain ordered Propranolol (which treats anxiety, psychosis, schizophrenia) 10 mg twice per day x 120 days and to continue the as needed order for this medication, to continue Prozac 40 mg by mouth every morning, to continue Depakote 250 mg by mouth every morning, and 500 mg at bedtime, and to continue Benadryl 25 mg twice per day and as needed. (Dkt. 49-5 at 7.)

On August 23, 2014, Dr. Khatain saw and assessed Kaelin. (Dkt. 49-5 at 17; 49-6 at 8-9.) On August 23, 2014, Dr. Khatain discontinued medications Kaelin did not want and ordered Chlonidine (treats ADHD) .1 mg by mouth twice per day and as needed for anxiety x 120 days. (Dkt. 49-5 at 4.)

On September 27, 2014, Dr. Khatain saw and assessed Kaelin. (Dkt. 49-5 at 16; 49-6 at 6.) The notes indicate Kaelin reported the Chlonidine was "working well" and had decreased his anxiety.. On September 29, 2014, Dr. Khatain decreased Chlonidine to .2 mg by mouth twice per day x 120 days, discontinued Benadryl, ordered Prozac 40 mg

by mouth every morning, ordered Depakote 250 mg by mouth every morning, and 500 mg by mouth at bedtime. (Dkt. 49-5 at 4.)

On October 13, 2014, the provider noted non-compliance with taking morning Chlonidine for six days. (Dkt. 49-5 at 6.) On October 19, 2014, Dr. Khatain decreased Chlonidine to .2 mg by mouth at bedtime only x 120 days, noting that Kaelin did not want his AM dose per nursing staff. (Dkt. 49-5 at 6.)

On November 1, 2014, Dr. Khatain noted that Kaelin requested as needed Clonidine and did not know why it was stopped. Dr. Khatain noted Corizon did not approve of giving this drug as needed. (Dkt. 49-5.) Dr. Khatain noted also that he would discuss the issue with Kaelin during his next visit.

On December 5, 2014, Dr. Khatain recorded that Kaelin did not need to be on a mental health hold from his perspective. He continued Depakote 1000 mg by mouth every morning x 30 days, and continued Venlafaxine 150 mg crushed by mouth every morning x 30 days. (Dkt. 49-5 at 14.)

On December 20, 2014, Dr. Khatain noted that Kaelin now wanted to stop taking the Chlonidine and requested to try Lithium. (Dkt. 49-6 at 5.) Based upon Kaelin's reported symptoms, Dr. Khatain discontinued Chlonidine, ordered Prozac 40 mg by mouth every morning x 120 days, ordered Lithium (treats mania) 300 mg by mouth twice per day, and ordered labs to review Lithium levels. (Dkt. 49-5 at 5; 49-6 at 5.) On January 31, 2015, Dr. Khatain saw Kaelin, who indicated he wanted Lithium because, "I like it." (Dkt. 49-6 at 4.) Kaelin reported that his anxiety was still about the same but his

**REPORT AND RECOMMENDATION  - 6**

moods were more stable and his depression was better. Kaelin asked to discontinue Prozac as not beneficial. *Id.*

On January 31, 2015, Dr. Khatain discontinued Prozac, as it no longer was working, decreased Depakote to 250 mg by mouth two times per day, ordered Buspar (anti-anxiety) 10 mg by mouth two times per day, and ordered Lithium 300 mg by mouth two times per day.dkt 49-5 at 3.

On February 4, 2015, Dr. Khatain increased Buspar to 20 mg by mouth two times per day x 120 days. (Dkt. 49-5 at 3.) On February 23, 2015, Dr. Khatain ordered Effexor 75 mg by mouth every morning x 120 days. (Dkt. 49-5 at 3.)

On March 3, 2015, Dr. Khatain saw Kaelin and agreed to his requests to discontinue Buspar, increase Effexor, and increase Depakote. (Dkt. 49-6 at 3.) Dr Khatain explained that he would make these changes, but in order to give the medications a chance to work, he would not adjust them for six weeks. (Dkt. 49-6 at 3.) Dr. Khatain increased Depakote to 250 mg by mouth every morning and 500 mg by mouth at bedtime, increased Effexor to 150 mg every morning, discontinued Buspar, and continued Lithium as previously ordered. Kaelin agreed to the plan.

On April 11, 2015, Dr. Khatain saw and assessed Kaelin, noting that Kaelin reported he liked Depakote because it stabilized his moods, and felt the Lithium helped. (Dkt. 49-6 at 2.) Dr. Khatain assessed Kaelin as having anxiety disorder and bipolar disorder. (Dkt. 49-6 at 2.) Dr. Khatain decreased Depakote to 500 mg by mouth every night before bed time x 120 days, discontinued Effexor, and increased Lithium to 600 mg

by mouth every morning and 300 mg by mouth every night before bed x 120 days. (Dkt. 49-6 at 2.)

Kaelin was transferred back from IMSI to ISCC on April 15, 2015. (Dkt. 49-6 at 1.) On May 5, 2015, Kaelin was assessed by Dr. Eliason after demanding the medications specified in his "court order," and requesting a medication change. (Dkt. 49-5 at 40.) Dr. Eliason discussed the case with Dr. Khatain, who noted that Kaelin frequently threatened "litigation to get medications that are inappropriate in this setting (even when clinical status do[es] not warrant such medications)." (Dkt. 49-5 at 40.) Dr. Eliason noted that several of the medications listed in the court order "were inappropriate (Xanax, Adderall, Wellbutrin and Testosterone) for the correctional environment." According to Dr. Eliason's assessment, Kaelin exhibited no current signs or symptoms of psychosis, was not in any acute mood episode, and was not a good candidate for the medications he was requesting. (Dkt. 49-5 at 40.) It was noted on May 22, 2015, that Kaelin was asymptomatic from a psychiatric perspective at that time. (Dkt. 49-6 at 1.)

According to Dr. Eliason, he has exercised his own "independent medical judgment as to diagnoses and treatment," and does not believe that the state court sentencing mitigation order directs him to act differently. Eliason Decl. ¶ 9 (Dkt. 49-4 at 4.) Dr. Eliason does not view the state court order to direct him to "abdicate [his] medical judgment in favor of a strict medication regiment." *Id.* ¶ 8. Since Kaelin's admission to IMSI, Dr. Eliason has seen Kaelin every one to three months, and Kaelin has appeared stable. *Id.* ¶ 11. Dr. Eliason reports that group therapy has been available to Kaelin, and

that the severity of Kaelin's psychiatric condition does not warrant individual psychotherapy. *Id.*

In Dr. Eliason's opinion, based upon his education, training, and experience and to a reasonable degree of medical certainty, the psychiatric care he and Dr. Khatain provided to Kaelin met or exceeded the standard of care in the community. Eliason Decl., ¶ 3. Kaelin has not designated or disclosed any experts to testify in this case. Eaton Decl. (Dkt. 49-3.)

**Warden Randy Blades and Warden Alberto Ramirez**

Warden Blades is an IDOC employee currently working at the ISCC as the warden. He was previously the warden of ISCI from July 2012 to December 2014. Blades Aff. ¶ 2 (Dkt. 50-3.) Warden Blades does not have supervisory authority over medical care at ISCC: medical services are provided by Corizon and its doctors. Blades Aff. ¶ 4-6.

Warden Blades received a concern form from Kaelin dated October 30, 2014, contending the medical staff was not complying with a court order requiring certain psychiatric medications. Blades Aff. ¶¶ 9-12. Warden Blades had no authority to take any action regarding the concern form, as the proper channel would have been for Kaelin to submit a request to the medical department. *Id.* Further, Warden Blades was aware Kaelin had a grievance pending with medical staff and was awaiting review by the IDOC health authority. Blades Aff. ¶ 13. Warden Blades was not provided with any information that would have led him to believe Kaelin was not receiving appropriate medical care. *Id.* ¶ 14-16.

**REPORT AND RECOMMENDATION - 9**

Warden Ramirez, also an IDOC employee, is the current warden at IMSI, and has been since July 1, 2012. Like Warden Blades, he has no supervisory authority over medical care at IMSI, as the physicians are employed by Corizon. Ramirez Aff. ¶¶ 1-5 (Dkt. 50-4.)  Warden Ramirez received three concern forms from Kaelin since his transfer to IMSI on April 15, 2015.

The first concern form, dated May 14, 2015, referred to the 2012 court order and requested the same treatment as outlined therein. Ramierez Aff. ¶ 8. Deputy Warden Randy Valley was asked to investigate the concern form. Valley Aff. ¶ 3 (Dkt. 50-5 at 2.) Valley received an update from the Health Services Administrator for Corizon at IMSI that medical care was being directed by Corizon physicians. Valley Aff. ¶ 6-7.

The second, dated June 5, 2015, again referred to the court order. Warden Ramirez directed Kaelin to address his treatment concerns with his medical care provider. The final concern form, dated June 6, 2015, requested placement at the Behavioral Health Unit at ISCI. Warden Ramirez responded that such a placement needed to be directed by the warden at ISCI. Warden Ramirez denies having received any information that would have led him to believe Kaelin was not receiving appropriate medical care. Ramirez Aff. ¶ 9.

An independent review of Kaelin's medical records was conducted by a medical contract monitor in February of 2014 and in May of 2014. Martin Aff. ¶ 2-6 (Dkt. 50-6 at 2.) A second independent review was prompted in January of 2016, following an inquiry from the United States Attorney's office into Kaelin's medical treatment. Cardona Aff. ¶ 5 (Dkt. 50-7 at 2.) Joseph Cardona, BSN, RN, CCHP-RN, reviewed Kaelin's medical

records and arrived at the conclusion that the patient therapy plan developed by Dr.
Eliason for Kaelin was appropriate to meet Kaelin's mental health needs. Cardona Aff.
¶ 6.

There is no notice of tort claim on file by Kaelin against the State of Idaho, the
IDOC, or its employees. Mason Aff. ¶ 3 (Dkt. 50-9 at 2.)

Kaelin's affidavit recites a narrative of his purported mental health issues, and
reaffirms his disagreement with the providers that the medications he has been prescribed
are appropriate. Kaelin contends the changes to his medication regimen constitute
deliberate indifference, relying almost exclusively upon the state court order entered at
the time of his sentencing in 2012.

## ANALYSIS

### 1.    Legal Standards

#### A.    *Summary Judgment*

Summary judgment is appropriate where a party can show that, as to any claim or
defense, "there is no genuine dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of
summary judgment "is to isolate and dispose of factually unsupported claims ...." *Celotex
Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural
shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or
defenses [can] be isolated and prevented from going to trial with the attendant
unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). The requirement is that there be no genuine dispute as to any material fact. "Material facts are those that may affect the outcome of the case." *See id*. at 248. The moving party is entitled to summary judgment if that party shows that each material issue of fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c) (3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec.*

**REPORT AND RECOMMENDATION  - 12**

*Serv.*, 809 F.2d at 630–31 (internal citation omitted). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue (dispute) as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

### B.   *Section 1983 Claims*

Kaelin brings his claims under 42 U.S.C. § 1983, the civil rights statute. To state a claim under § 1983, Kaelin must establish the existence of four elements: "(1) a violation of rights protected by the Constitution or created by federal statute (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Section 1983 is "'not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

"Liability under section 1983 arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted). In other words, Kaelin must show that Defendants' actions caused the deprivation of a

**REPORT AND RECOMMENDATION  - 13**

constitutional right. 42 U.S.C. § 1983; *Arnold v. International Business Machines Corp*., 637 F.2d 1350, 1355 (9th Cir. 1981). "The causation requirement of § 1983 ... is not satisfied by a showing of mere causation in fact[;][r]ather, the plaintiff must establish proximate or legal causation." *Id*. The United States Court of Appeals for the Ninth Circuit has explained: "A person subjects another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivations of which he complains." *Id*. (internal citation omitted).

### C.   *Eighth Amendment Claims of Inadequate Medical Care*

To state a claim under the Eighth Amendment, Kaelin must show that he is incarcerated "under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citation omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012). Regarding the objective standard for prisoners' medical care claims, the Supreme Court of the United States has explained that, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The Ninth Circuit has defined a "serious medical need" in the following ways:

[F]ailure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain [;] ... [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain .... *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds, WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, a prison official acts with "deliberate indifference ... only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nev*., 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837). "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted).

In the context of medical care, a conclusion that a defendant acted with deliberate indifference requires the plaintiff to show both "a purposeful act or failure to respond to a prisoner's pain or possible medical need and ... harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in

intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (footnotes omitted).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Additionally, mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). Nor does the Eighth Amendment provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Finally, a mere delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

**REPORT AND RECOMMENDATION  - 16**

2.      **Discussion**

   A.      *Eighth Amendment Claims Against Drs. Eliason and Khatain*

Kaelin first argues that the January 2012 state court order provides a basis for his Eighth Amendment Claim. It does not. Idaho Code § 19-2523, pursuant to which the order was entered, requires consideration of mental illness during sentencing. The state sentencing court must "authorize treatment during the period of confinement or probation specified in the sentence if, after the sentencing hearing, it concludes by clear and convincing evidence" that the defendant suffers from a mental illness requiring treatment. Idaho Code § 19-2523(2). The court is required to authorize treatment to continue. Nothing in the statute dictates that specific treatment or medication be ordered or imposed by the court.

Although in this case the state court ordered that Kaelin, during the period of confinement, "shall continue to receive the psychiatric medications" listed, the Court has conducted a careful review of the medical records, and the briefs and affidavits submitted by the parties. The Court finds Kaelin's claims that, without the listed medications, he has received constitutionally inadequate medical care to be without merit.

According to the undisputed facts, Kaelin has been receiving continued treatment for his psychiatric condition, and has been offered group therapy. Throughout the course of treatment provided by Drs. Eliason and Khatain, they have independently assessed his medication regimen, and provided medications to address his symptoms. On several occasions, Kaelin reported his anxiety and mood instability had improved in response to certain medications, specifically Lithium and Depakote. The state court order, which

**REPORT AND RECOMMENDATION  - 17**

authorized treatment to continue, does not does not require medical care providers to ignore their own medical judgment.

Further, the medical records the Court reviewed reflect that either Dr. Khatain or another provider personally saw and assessed Kaelin on at least eight occasions between February 2, 2014 and May 5, 2015. Other records indicate Dr. Khatain responded to numerous medical concern forms Kaelin submitted about his medications within days of the concern form, by adjusting the medications provided. Dr. Khatain adjusted Kaelin's medications several times between February of 2014 and April of 2015, often in response to Kaelin's self-reports regarding improvement in his symptoms or side effects of the drugs. To address Kaelin's mental health symptoms, Dr. Khatain prescribed Depakote, Zyprexa, Effexor, Prolixin and Lithium. In May of 2015, shortly after Kaelin's transfer to IMSI, Dr. Eliason assessed Kaelin's mental health status, and found him to be asymptomatic on his current medication regimen.

The facts of this case fall squarely within the well-settled law that an inmate does not have a claim for deliberate indifference simply because he disagrees with his provider about the appropriate course of medical care and treatment. Kaelin's insistence upon receiving a specific medication is a disagreement between a prisoner and a medical provider, which alone is not actionable under the Eighth Amendment.

**B.**    ***State Law Claims of Medical Negligence Against Drs. Eliason and Khatain***

The elements of a medical malpractice claim are set forth in § 6-1012 of the Idaho Code:

> In any case, claim or action for damages due to injury to or
> death of any person, brought against any physician and
> surgeon or other provider of health care . . . such claimant or
> plaintiff must, as an essential part of his or her case in chief,
> affirmatively prove by direct expert testimony and by a
> preponderance of all the competent evidence, that such
> defendant then and there negligently failed to meet the
> applicable standard of health care practice of the community
> in which such care allegedly was or should have been
> provided....

Idaho Code § 6-1012.

The elements of a negligence action are the following: '(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage.'" *Jones v. Starnes*, 245 P.3d 1009, 1012 (Idaho 2011) (quoting *Hansen v. City of Pocatello*, 184 P.3d 206, 208 (Idaho 2008)).

Idaho Code § 6-1012 requires that, in a medical malpractice case, a plaintiff must prove that the defendant physician negligently failed to meet the applicable standard of health care practice of the community in which the health care was, or should have been, provided. The statute also provides that the defendant physician "shall be judged . . . in comparison with similarly trained and qualified [physicians] . . . in the same community, taking into account his or her training, experience and fields of medical specialization, if any." Idaho Code § 6-1012.

Idaho Code § 6-1013 provides that the applicable standard of practice and the failure of the defendant physician to meet this standard must be established by plaintiff providing "one (1) or more knowledgeable, competent expert witnesses." This expert

testimony may be admitted in evidence only if a foundation is first laid establishing (a) that the "opinion is actually held by the expert witness," (b) that the "opinion can be testified to with reasonable medical certainty", and (c) that the "expert witness possesses professional knowledge and expertise coupled with actual knowledge of the applicable community standard to which the testimony of the witness is addressed." Idaho Code § 6-1013.

Kaelin has not provided the evidence required by Idaho Code § 6-1013, and "in forma pauperis" status does not mandate the funding of expert witnesses for indigents. Further, the affidavit of Dr. Eliason reflects that he independently reviewed the medical records, and, consistent with Idaho Code § 6-1013, is of the opinion that he and Dr. Khatain met the community standard of care. Without a countervailing opinion, Kaelin's state law claims of medical malpractice or negligence by Drs. Eliason and Khatain are subject to summary judgment dismissal.[3]

### C.   Eighth Amendment Claims Against Warden Blades and Warden Ramirez

Wardens Blades and Ramirez are being sued in their capacities as supervisors of the prisons. A defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir.2011). "A plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of

---

[3] Further, upon dismissal of the Eighth Amendment claims, the Court may decline to exercise supplemental jurisdiction over related state law claims. *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir.2008).

**REPORT AND RECOMMENDATION  - 20**

the injury. The law clearly allows actions against supervisors under Section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived, under color of law of a federally secured right." *Id*. (quoting *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991) (en banc)).

Here, the record reflects Warden Blades received a concern form on October 30, 2014, and directed Kaelin to submit his concerns to the medical staff. Blades was aware also that medical staff was reviewing a pending grievance regarding the same issue raised in the concern form. There is no disputed issue of material fact indicating Warden Blades denied, delayed, or intentionally interfered with Kaelin's medical treatment to give rise to an Eighth Amendment claim. *See Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (prison officials who deny, delay, or intentionally interfere with medical treatment may be liable for an Eighth Amendment violation).

Similarly, the record indicates Warden Ramirez, upon receiving three separate concern forms from Kaelin about the prison medical physicians failing to follow the 2012 state court order, directed an investigation. Two independent medical reviews were conducted as well, finding Kaelin's care adequate. Ramirez had no other indication that the care Kaelin was receiving was other than adequate to address his mental health needs. There is no disputed issue of material fact that Warden Ramirez denied, delayed, or intentionally interfered with Kaelin's medical treatment to give rise to an Eighth Amendment claim.

**REPORT AND RECOMMENDATION  - 21**

### D.     State Law Claims Against Warden Blades and Ramirez

Kaelin does not set forth with any specificity what the state law claims are against the two wardens. Nonetheless, the Court allowed the potential negligence claims to proceed.

Idaho Code § 6-906 provides: "[n]o claim or action shall be allowed against a governmental entity or its employee unless the claim has been presented and filed within the time limits prescribed by this act." The Idaho Tort Claim Act requires notice of claim to be presented and filed within 180 days from the date the claim arose. Idaho Code § 6-906.

A "claim" under the ITCA is "any written demand to recover money damages from a governmental entity or its employee which any person is legally entitled to recover under this act as compensation for the negligent or otherwise wrongful act or omission of a governmental entity or its employee." *Id*. § 6-902(7). "No claim or action shall be allowed against a governmental entity or its employee unless the claim has been presented and filed within the time limits prescribed by this act." *Id*. § 6-908 (emphasis added); *see Turner v. City of Lapwai*, 339 P.3d 544, 550 (2014) (dismissing tort claims because they were not filed with the city clerk).

The undisputed evidence indicates no notice of tort claim regarding Kaelin's complaint against Warden Blades or Warden Ramirez was ever filed. Summary judgment is therefore appropriate.

**REPORT AND RECOMMENDATION  - 22**

## CONCLUSION

Kaelin has failed to satisfy his burden upon summary judgment of showing that the materials in the record establish the presence of a genuine factual dispute. The Court will therefore recommend that Defendants' motions be granted.

## **RECOMMENDATION**

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1)      Defendants' Motion for Summary Judgment (Dkt. 49) be **GRANTED**.

1)      Defendants' Motion for Summary Judgment (Dkt. 50) be **GRANTED**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

Dated: **October 31, 2016**

Honorable Candy W. Dale
United States Magistrate Judge

**REPORT AND RECOMMENDATION  - 23**